IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| CECIL KOGER, | CASE NO. 4:17-CV-2409 |
| Plaintiff, | JUDGE BENITA Y. PEARSON |
| v. | **AMENDED COMPLAINT** |
| DIRECTOR GARY C. MOHR (sued in his individual and official capacities), *et al.*, | |
| and | |
| DAVE BOBBY and DAVE MARQUIS (sued in their official capacities), | |
| New-Party Defendants. | |

Plaintiff Cecil Koger states the following as his Amended Complaint[1] against:

- Defendants Ohio Department of Rehabilitation and Correction ("ODRC"), ODRC Director Gary C. Mohr, ODRC Northeast Regional Director Todd Ishee, ODRC Northwest Regional Director Dave Bobby, and ODRC Religious Services Administrator Michael Davis (collectively, the "ODRC Defendants");

---

[1] Defendants have given their "written consent" to Mr. Koger to file this Amended Complaint. *See* Fed. R. Civ. P. 15(a)(2); *see also* 5/23/18 Case Mgmt. Conf. Order (ECF 29), ¶ 13.

- Warden Charmaine Bracy of the Trumbull Correctional Institution ("TCI"), TCI Chaplain Alexander Kostenko, and former TCI Deputy Warden Richard Bowen, Jr. (collectively, the "TCI Defendants"); and

- Warden Dave Marquis of the Richland Correctional Institution ("RCI").

The ODRC Defendants, the TCI Defendants, and Warden Marquis are collectively referred to herein as "Defendants."

## PRELIMINARY STATEMENT

1. This case is about Defendants' denial of Mr. Koger's right to exercise his Rastafarian faith, in particular their establishment and implementation of policies that categorically forbid wearing of dreadlocks as mandated by his religion. Defendants' policies and practices substantially burden Mr. Koger's religious exercise without serving a compelling governmental interest in the least restrictive manner.

2. The federal Bureau of Prisons and the majority of state prison systems permit inmates to either wear dreadlocks or apply for religious accommodations allowing them. Defendants' failure to recognize and provide a specific policy for religious accommodations to Rastafarian inmates severely impedes Mr. Koger's ability to practice his religion.

3. Defendants maintain faith-specific policies for, and afford religious accommodations to, inmates practicing numerous other religions, but Defendants have consistently denied Mr. Koger's accommodation requests as a practitioner of Rastafarianism.

2

4. On multiple occasions, Defendants have denied Mr. Koger access to Rastafarian religious texts, dietary accommodations, and a head covering, yet they afforded similar accommodations to similarly situated inmates of other faiths. Defendants have also permitted non-Rastafarian inmates to wear dreadlocks.

5. Defendants have forced Mr. Koger, along with other Rastafarian inmates, to comply with prison policies that directly conflict with the tenets of his faith for fear of disciplinary action by the prison. One or more of the ODRC Defendants and the TCI Defendants have punished Mr. Koger for his religious devotion—force-cutting his dreadlocks, covering him in oleoresin capsicum spray ("OC spray," commonly known as "pepper spray"), and confining him to the segregation unit. Defendants consistently fail to provide meaningful, individualized assessments of Mr. Koger's religious-accommodation requests. And unless otherwise enjoined, the ODRC Defendants with jurisdiction over RCI and Warden Marquis will continue to deprive Mr. Koger of his right to observe his religious beliefs and/or punish him for doing so.

6. Mr. Koger brings this civil-rights action under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc, *et seq*. ("RLUIPA"), and 42 U.S.C. § 1983. He seeks declaratory and injunctive relief under RLUIPA against the ODRC Defendants with jurisdiction over RCI and against Warden Marquis to ensure that they officially recognize Rastafarianism as a religion and afford individualized assessments, rights, protections, and accommodations to its practitioners—including the right to wear dreadlocks—just as they already provide to practitioners of other faiths. He seeks declarative and injunctive relief against the ODRC Defendants with jurisdiction over RCI

3

and Warden Marquis under 42 U.S.C. § 1983 for their violations of his constitutional rights under the Free Exercise and Establishment Clauses of the First Amendment (as incorporated under the Fourteenth Amendment) and the Equal Protection Clause of the Fourteenth Amendment. And he seeks monetary relief against the ODRC Defendants with jurisdiction over TCI under 42 U.S.C. § 1983 for the same constitutional violations.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over Mr. Koger's claims for violations of his federal statutory and constitutional rights under 28 U.S.C. § 1331 (federal-question jurisdiction) and 28 U.S.C. § 1343(a)(3) (jurisdiction over federal constitutional claims).

8.     Venue lies in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this district.

## PARTIES

### The Plaintiff

9.     Plaintiff Cecil Koger was an inmate at TCI and is now an inmate at RCI. Both are correctional facilities managed by and subject to the policies promulgated by ODRC and its supervisory personnel. Mr. Koger has been housed at at least seven different ODRC facilities since 2000: Correctional Reception Center, Madison Juvenile Correctional Facility, MCI Institution ("MCI"), Toledo Correctional Institution ("Toledo CI"), Allen Correctional Institution, TCI, and now RCI. Mr. Koger is a practicing member of the Nyahbinghi Rastafarian Order and has requested and been denied religious accommodations at each of these facilities.

4

**The Defendants**

10.     Defendant Gary C. Mohr is the Director of ODRC. He has had at all relevant times the authority to manage, direct, and establish rules and regulations for the various institutions of ODRC, including TCI and RCI, as well as the departments responsible for creating both grooming and religious-accommodation policies. OHIO REV. CODE § 5120.01. Mr. Koger sues Defendant Mohr in his individual and official capacities.

11.     Defendant Michael Davis at all relevant times has been the Religious Services Administrator of ODRC. In that capacity, he has been responsible for enforcing ODRC's religious-services policies and making all final decisions on appeals of religious-accommodation requests made by inmates housed in ODRC facilities, including TCI and RCI. ODRC 72-REG-02. Mr. Koger sues Defendant Davis in his individual and official capacities.

12.     Defendant Dave Bobby is the Northwest Regional Director of ODRC and is currently responsible for establishing and enforcing ODRC policies in the Northwest region of Ohio, including RCI. Mr. Koger sues Defendant Bobby in his official capacity.

13.     Defendant Dave Marquis is the Warden of RCI and is the managing officer responsible for making final institutional determinations on inmates' religious-accommodation requests and for overseeing the enforcement of grooming policies at RCI. Mr. Koger sues Defendant Marquis in his official capacity.

14.     Defendant Todd Ishee at all relevant times was the Northeast Regional Director of ODRC and was responsible for establishing and enforcing ODRC policies in

5

the Northeast region of Ohio, including TCI, while Mr. Koger was an inmate there. Mr. Koger sues Defendant Ishee in his individual capacity.

15.     Defendant Charmaine Bracy was at all relevant times the Warden of TCI. In that capacity, she was the managing officer responsible for making final institutional determinations on inmates' religious-accommodation requests and for overseeing the enforcement of grooming policies at TCI while Mr. Koger was an inmate there. Mr. Koger sues Defendant Davis in her individual capacity.

16.     Defendant Alexander Kostenko was at all relevant times a chaplain at TCI and was responsible for evaluating and recommending dispositions of inmates' religious-accommodation requests to TCI's Religious Accommodation Review Committee. Mr. Koger sues Defendant Kostenko in his individual capacity.

17.     Defendant Richard Bowen, Jr. was at all relevant times the Deputy Warden at TCI and was responsible for giving orders related to disciplinary action and force-cuts of inmate hair, including Mr. Koger's. Mr. Koger sues Defendant Bowen in his individual capacity.

## **FACTUAL ALLEGATIONS**

### **Cecil Koger's Membership in the Nyahbinghi Rastafarian Order and his Religious Practices**

18.     Mr. Koger is and since 2000 has been a committed member of the Nyahbinghi Rastafarian Order. His family has been practicing Rastafarianism for generations.

19.     The Nyahbinghi Rastafarian Order is a strict branch of Rastafarianism, which aims to maintain the link between Rastafarian faith and African heritage.

6

20.     Rastafarianism is an Abrahamic religion. The first branch of Rastafarianism was established in 1935. Rastafarianism is recognized as a religion by the federal Bureau of Prisons. U.S. DEP'T. OF JUSTICE, FED. BUREAU OF PRISONS, INMATE RELIGIOUS BELIEFS AND PRACTICES GUIDE (2002).

21.     Wearing dreadlocks is a major tenet of Mr. Koger's Rastafarian faith. Rastafarians believe that hair must grow and "lock" naturally, symbolizing the Lion of Judah and the Nazarites in the Bible. Dreadlocks embody Rastafarians' commitment to live "righteously and naturally" and reflect an "outward commitment" to Jah, or God. *Id.*

22.     Rastafarians take the Nazarite vow, which they believe is commanded by the Bible: "They shall not make baldness upon their head, neither shall they shave off the corner of their beard, nor make any cuttings in their flesh." LEVITICUS 21:5.

23.     Another tenet of Mr. Koger's faith requires adherence to a specific diet, called *ital*, which prohibits consuming processed foods.

24.     Mr. Koger's faith also requires him to observe specific fasting periods.

25.     Rastafarians celebrate their annual holiday on November 2, commemorating the coronation of Haile Selassie I—a central figure in Rastafarian worship—as Emperor of Ethiopia.

26.     Rastafarians congregate to celebrate holidays in worship services called "groundings."

27.     Mr. Koger has submitted numerous requests for religious accommodations throughout his sentence in ODRC facilities for wearing dreadlocks, following an *ital* diet,

fasting during specific holidays, accessing recognized religious texts, and participating in religious gatherings with his fellow Rastafarian inmates.

28.     Mr. Koger has provided pamphlets and guides explaining the tenets of Rastafarianism, including the significance of dreadlocks and the fasting dates, to ODRC staff on multiple occasions.

29.     Defendants, in conjunction with other ODRC officials, TCI staff, and RCI staff, have denied virtually all of Mr. Koger's requests and substantially burden his ability to practice his religion.

### The Vast Majority of Jurisdictions Implement Prison Grooming Policies that Permit Rastafarian Inmates to Wear Dreadlocks or to Seek Accommodations to Do So

30.     At least 39 jurisdictions and correctional departments, including the federal Bureau of Prisons,[2] allow inmates to maintain dreadlocks or afford Rastafarian inmates the opportunity to "apply for a religious accommodation that would allow dreadlocks." *Ware v. La. Dep't of Corr.*, 866 F.3d 263, 273 (5th Cir. 2017).

31.     For example, the New York State Department of Corrections and Community Supervision specifically allows any inmate that is "***Rastafarian***, Taoist, Sikh, Native American, Orthodox Jew or member of any other religious sect of a similar nature" an exception to its haircut requirement. N.Y. St. Corr. & Cmty Supervision, Inmate Grooming Standards (Mar. 1, 2013) (emphasis added).

---

[2] *See* U.S. Dep't of Justice, Fed. Bureau of Prisons, Program Statement 5230.05, (Nov. 4, 1996) (stating that Policy §551.1 allows an inmate to select the hair style of personal choice).

8

32.    The Wyoming Department of Corrections states that "hairstyles that are religiously indicated by the mandatory tenets of the inmate's professed religion, as verified by an approved religious representative of that faith . . . will be authorized as long as the hair is capable of being searched and does not present a health or safety hazard (i.e., Orthodox Judaism, Native American, *Rastafarian*, Sikh.)" WYO. DEP'T OF CORR., INMATE HANDBOOK 8 (2013) (emphasis added).

33.    Several jurisdictions require searches of inmates' hair but forbid force-cutting. For example, the Tennessee Department of Corrections Policy states that "inmates shall be routinely subject to searches of hair," but "forcible cutting or trimming shall not be done except upon orders of a physician for health reasons." TENN. DEP'T OF CORR., ADMINISTRATIVE POLICIES AND PROCEDURES 502.03 (2015).

34.    Ohio, on the other hand, substantially burdens Rastafarian inmates' ability to freely practice their religion by prohibiting dreadlocks without exception, thereby denying all Rastafarians the right to practice their religious faith.

### Defendants Enforce the Grooming Policy and No-Exemptions Memo as an Absolute Prohibition on Dreadlocks

35.    OHIO ADMIN. CODE § 5120-9-25(D) (the "Grooming Policy") states that "[t]he following hairstyles or facial hair are not permitted: Initials, symbols, dyes, multiple parts, hair disproportionately longer in one area than another (excluding natural baldness), weaves, and *dreadlocks*" (emphasis added).

36.    The ODRC Defendants interpret and enforce the Grooming Policy as an absolute prohibition on dreadlocks in ODRC facilities and refuse to consider or grant inmate religious accommodation requests to maintain dreadlocks.

9

37.     In November 2014, former TCI Warden Christopher LaRose distributed a memorandum (the "No-Exemptions Memo") concerning dreadlocks, stating, in bold, that all offenders should "**[b]e advised there are no religious exemptions for this hairstyle**." MEMO. FROM WARDEN LAROSE TO ALL OFFENDERS (Nov. 30, 2014) (emphasis in original).

38.     Upon information and belief, the No-Exemptions Memo remains ODRC, TCI, and RCI policy and has not been rescinded or modified.

39.     In practice, Defendants enforce the Grooming Policy arbitrarily, requiring the force-cutting of only select inmates' hair and allowing other inmates to grow dreadlocks.

40.     Upon information and belief, at all relevant times there were more than 30 inmates with dreadlocks at TCI, several of whom had dreadlocks longer than shoulder-length.

41.     Some TCI inmates who have refused to comply with orders to cut their own dreadlocks have been subject to the force-cut of their dreadlocks by TCI staff under TCI's Rules Infraction Board ("RIB") procedures.

42.     Upon information and belief, TCI Defendants have forcibly cut only Rastafarian inmates' dreadlocks and have not cut non-Rastafarian inmates' dreadlocks.

### The ODRC Defendants Maintain Faith-Specific Policies Establishing Accommodations for Several Recognized Religions but Refuse to Maintain a Faith-Specific Policy for Rastafarian Inmates

43.     ODRC's policy on Institutional Religious Services states that it is departmental policy "to ensure that inmates, who wish to do so, may subscribe to any

religious belief they choose." The policy recognizes that an inmate's "religious practices, as opposed to belief, may be subject to reasonable . . . restrictions." ODRC 72-REG-01(V).

44.    ODRC officially recognizes and maintains policies specific to individual religions to guide staff members in "providing for the religious activities and practices of inmates . . . ." ODRC 72-REG-03(II).

45.    ODRC currently maintains faith-specific policies for members of nine ODRC-recognized faiths: Protestant, Jewish, Muslim, Roman Catholic-Orthodox, Jehovah Witness, Buddhist, Native American, Wiccan, and Asatru.

46.    The faith-specific policies provide detailed guidance for ODRC staff on the tenets and practices of each religion.

47.    The faith-specific policies list "generally approved accommodations for qualified inmates wishing to practice the subject faith." *Id.*

48.    Each faith-specific policy contains a "Procedures" section that establishes ODRC-approved accommodations related to congregate services, religious articles, group study, individual religious exercise, religious property for individual observance, major holidays, work proscriptions, diet, and medical treatment.

49.    The faith-specific policies serve both to permit inmate practitioners to exercise the identified faiths and to educate ODRC staff on the tenets of the faiths to improve staff's management of religious activities and practices.

50.    For example, the ODRC Asatru Religious Policy identifies THE POETIC EDDA as a recognized text for the Asatru faith, defines the "blot" and "sumbel" Asatru religious practices, and establishes accommodations for individual religious property, including

11

Gandr staffs, rune stone sets, Thor's Hammer medallions, personal mead horns, and oath rings. Asatru group worship services are scheduled to coincide with the twelve major Asatru religious holidays when Asatru inmates are permitted to wear a headband. ODRC 72-REG-10(IV–VI).

51. ODRC's Jewish Religious Services policy provides that "[o]bservant male" inmates may apply for religious accommodations to "refrain from cutting the hair growing from their temples or sides of their heads" and from "shav[ing] or cut[ting] their beards." ODRC 72-REG-07(V).

52. ODRC's Jewish Religious Services policy establishes that "[t]he Department will accommodate kosher dietary restrictions to recognized Jewish inmates . . . ." *Id.*

53. ODRC's Native American Religious Services policy permits Native American inmates to possess and wear headbands for worship ceremonies and in housing units. ODRC 72-REG-13(VI).

54. ODRC's Muslim Religious Services policy establishes that Muslim inmates will be provided with a diet "free of all pork and all products containing or derived from pork." ODRC 72-REG-12(VI).

55. ODRC's Muslim Religious Services policy also permits Muslim inmates to wear *kufis* and traditional Muslim caps. The policy does not prohibit Muslims from wearing beards in accordance with their faith's dictates. *Id.*

56. Further, ODRC's Muslim Religious Services policy allows for female inmates to wear an approved headscarf and for all Muslim inmates to fast during Ramadan. *Id.*

57.     The ODRC Defendants maintain no faith-specific policy for practitioners of the Rastafarian faith.

58.     The ODRC Defendants provide no faith-specific policy or guidance permitting Rastafarian inmates to seek accommodations to wear dreadlocks and tams, maintain an *ital* diet in accordance with the mandates of their faith, or access Rastafarian religious texts.

59.     The ODRC Defendants provide ODRC staff with no instruction or guidance on accommodating or managing the religious activities and practices of Rastafarian inmates.

**Defendants' Refusal to Recognize Rastafarianism as a Religion Causes the ODRC Defendants and Staff to Consistently Deny Mr. Koger's Requests for Religious Accommodations**

60.     ODRC establishes religious accommodation procedures that are intended for inmates seeking accommodations "not addressed directly within policy." ODRC 72-REG-02(IV).

61.     In practice, however, the ODRC Defendants' failure to officially recognize Rastafarianism has proven fatal to Mr. Koger's attempts to secure religious accommodations throughout his incarceration. None of his requests has received an individualized assessment.

62.     Mr. Koger submitted an initial request for an accommodation to grow dreadlocks, wear a tam to cover his hair, and access religious texts on August 23, 2006, while incarcerated at MCI.

63.     Mr. Koger filed a follow-up request for a religious accommodation to grow his dreadlocks on November 15, 2006, while still incarcerated at MCI.

64.     In a decision dated December 8, 2006, the MCI Warden denied Mr. Koger's religious-accommodation requests.

65.     Mr. Koger wrote to Gary Sims, Sr., ODRC's former Religious Services Administrator, appealing the MCI warden's denial. Mr. Sims affirmed the denial of Mr. Koger's accommodation

66.     On December 19, 2009, at Toledo CI, Mr. Koger filed another request for religious accommodation to receive an *ital* diet. This request was denied December 28, 2009.

67.     Mr. Koger challenged the Toledo CI decision to ODRC's Mr. Sims.

68.     On February 11, 2010, Mr. Sims denied Mr. Koger's request for a dietary accommodation at Toledo CI. Mr. Sims provided no further explanation for the denial.

69.     After transferring to TCI, Mr. Koger filed multiple religious-accommodation requests—including on or around March 1, 2017—to wear dreadlocks and a tam, receive an *ital* diet, and maintain Rastafarian religious texts.

70.     As of the date of the filing of this action, Mr. Koger's had received no response to his most-recent religious-accommodation requests.

### Defendants' Refusal to Recognize Rastafarianism as a Religion Causes ODRC Staff to Force-Cut Mr. Koger's Dreadlocks on Multiple Occasions

71.     Because of Defendants' refusal to consider Mr. Koger's requests for religious accommodations to the Grooming Policy, ODRC staff have force-cut Mr. Koger's dreadlocks five times throughout his seventeen years in ODRC facilities.

14

72.     In January 2000, staff at the Correctional Reception Center force-cut Mr. Koger's dreadlocks as part of his intake.

73.     In 2003, MCI staff forced Mr. Koger to comply with an order to cut his dreadlocks after threatening to mace him and force-cut his dreadlocks.

74.     In 2007, MCI staff force-cut Mr. Koger's dreadlocks after Mr. Koger refused to comply with an order to cut his dreadlocks based on his religious beliefs.

75.     In 2009, Toledo CI staff force-cut Mr. Koger's dreadlocks.

76.     In November 2016, TCI staff force-cut Mr. Koger's dreadlocks.

### Defendants' Inconsistent and Arbitrary Enforcement of the Dreadlocks Ban Refutes Their Articulated Security Concerns

77.     Despite the absolute prohibition on dreadlocks established by the Grooming Policy, ODRC institutions have elected not to enforce the prohibition on dreadlocks against Mr. Koger on arbitrary occasions, undermining any security and prison-safety interests purportedly furthered by the Grooming Policy.

78.     For example, ODRC staff have permitted Mr. Koger to wear dreadlocks during his transfers between different ODRC institutions, deviating from a specific contrary directive from ODRC's Transportation Coordinator. *See* MEMO. FROM ERLANA SCHORR (Oct. 9, 2014).

79.     Mr. Koger wore dreadlocks during his transfer from MCI to Toledo CI, from Toledo CI to Allen Correctional Institution, and from Allen Correctional Institution to TCI.

80.     At different periods during his incarceration, Mr. Koger has appeared in court and been transported for medical treatment while wearing dreadlocks.

81.     On numerous occasions, Defendants satisfied security or prison-safety interests by requiring Mr. Koger to run his own fingers through his hair after turning his head upside down.

**Defendants Fail to Consider Mr. Koger's Religious-Accommodation Request Before Punishing Him and Force-Cutting his Dreadlocks in November 2016**

82.     Mr. Koger was transferred to TCI in 2014.

83.     Despite the Grooming Policy and No-Exemptions Memo explicitly prohibiting TCI inmates from wearing dreadlocks, Mr. Koger wore dreadlocks without interference from TCI staff for approximately 18 months following the dissemination of the No-Exemptions Memo.

84.     In or around June 2016, a TCI Unit Manager informed Mr. Koger that TCI would soon enforce the Grooming Policy and No-Exemptions Memo and would remove his dreadlocks. The Unit Manager told Mr. Koger that no religious accommodations would be considered for his dreadlocks.

85.     Mr. Koger sent letters to Defendants Mohr and Davis inquiring about a religious accommodation to the Grooming Policy based on his Rastafarian faith. At the time of filing this action, Mr. Koger had received no response to those letters.

86.     On or around July 13, 2016, Mr. Koger filed an informal grievance with TCI Institutional Inspector Kim Frederick, expressing concern about TCI's plan to enforce the Grooming Policy despite Mr. Koger's religious tenets and claiming that the action would be discriminatory. At the time of filing this action, Mr. Koger had received no response from Ms. Frederick.

87.     On September 21, 2016, Defendant Bowen issued Mr. Koger a direct order to cut his dreadlocks to comply with the Grooming Policy. Mr. Koger refused the order.

88.     Defendant Bowen issued Mr. Koger a conduct report for a "Rule 21" violation based on Mr. Koger's refusal to comply with the order to cut his dreadlocks.

89.     On or around September 21, 2016, Mr. Koger informed Defendants Bracy and Bowen of his intention to file a religious-accommodation request concerning the Grooming Policy.

90.     Defendants Bracy and Bowen both told Mr. Koger that his attempts to secure an accommodation would be futile because ODRC did not recognize Rastafarianism as a religion.

91.     Defendant Bracy claimed that Defendant Mohr and ODRC's legal department informed her that no religious-accommodation requests would be granted to allow inmates to maintain dreadlocks.

92.     On October 6, 2016, TCI's RIB found Mr. Koger guilty of disobeying Defendant Bowen's direct order to cut his dreadlocks.

93.     That same day, the RIB ordered the force-cut of Mr. Koger's dreadlocks and placed Mr. Koger in the segregation unit.

94.     On October 12, 2016, Mr. Koger filed an appeal of the RIB decision, requesting that TCI recognize an accommodation to the Grooming Policy based on his sincerely held religious beliefs.

95.     Mr. Koger met with Defendant Kostenko after the appeal of his RIB decision was denied. Defendant Kostenko told Mr. Koger that ODRC would not consider a religious accommodation for his dreadlocks.

96.     On October 18, 2016, Mr. Koger filed an informal complaint resolution ("ICR") with Defendant Davis, describing TCI's refusal to consider Mr. Koger's requests for religious accommodations and the pending force-cut of his dreadlocks based on the October 6 RIB decision.

97.     On October 21, 2016, Defendant Davis returned Mr. Koger's ICR and informed Mr. Koger that an ICR was an improper means of appealing the RIB decision. Defendant Davis' letter stated: "There are no exemptions for dreadlocks."

98.     On October 27, 2016, Defendant Bracy affirmed the October 6 RIB decision ordering the force-cut of Mr. Koger's dreadlocks. Defendant Bracy noted that Mr. Koger raised the issue of a religious accommodation in his defense but affirmed the RIB decision without further comment.

99.     On October 28, 2016, the day after Defendant Bracy's decision to uphold the force-cut, TCI staff left religious-accommodation request forms in Mr. Koger's cell in the segregation unit. That same day, Mr. Koger filed a formal religious-accommodation request for an exemption from the Grooming Policy.

100.    On November 1, 2016, before Defendants took any steps to review Mr. Koger's religious-accommodation request, Defendant Bracy emailed Defendant Ishee to advise him that Mr. Koger had exhausted his appeals and that TCI was ready to take the "next steps" and implement the force-cut of Mr. Koger's dreadlocks.

101. Defendant Ishee responded on November 1, 2016, asking in an email whether all requirements, including "religious accommodation[s]," had been met prior to developing a plan for the force-cut. Defendant Ishee copied Defendant Bowen, Defendant Davis, and ODRC legal staff Trevor Clark and Ryan Dolan on this email.

102. Mr. Clark forwarded a copy of ODRC's policy on the implementation of force-cuts to Defendant Ishee.

103. Upon information and belief, Defendants failed to discuss Mr. Koger's October 28 religious-accommodation requests prior to moving forward with the implementation of the force-cut of Mr. Koger's dreadlocks.

104. On November 1, 2016, Defendant Ishee informed Defendant Bracy that TCI was approved to develop a plan for the force-cut.

105. On the evening of November 1, 2016, TCI Major Christopher Harris sent Defendant Bracy a Use of Force Plan of Action, scheduling the force-cut of Mr. Koger's dreadlocks for the following day.

**TCI Staff Force-Cut Cecil Koger's Dreadlocks**

106. On November 2, 2016, Major Harris and other TCI staff arrived at Mr. Koger's cell in the segregation unit and informed Mr. Koger that he could either comply with the order to cut his own dreadlocks or TCI staff would force-cut them.

107. Immediately prior to the force-cut, Mr. Koger reminded Major Harris and other TCI staff that November 2 is the holiest day for Rastafarians, on which they celebrate the Coronation of Emperor Haile Selassie I, making the force-cut particularly offensive.

108.    Mr. Koger reiterated that he refused to cut his dreadlocks based on his religious beliefs.

109.    When Mr. Koger refused to leave his cell, Major Harris administered OC spray into the cell.

110.    Major Harris administered at least seven or eight continuous bursts of OC spray to overwhelm Mr. Koger before he exited the cell.

111.    When Mr. Koger exited the cell, TCI staff shackled him and force-cut his dreadlocks.

112.    TCI staff videotaped the procedure but have refused to provide a copy to Mr. Koger in response to an Ohio Public Records Act request.

113.    After the force-cut, TCI staff returned Mr. Koger to the same cell, which was still covered in OC spray.

114.    The force-cut of his dreadlocks left Mr. Koger emotionally traumatized. Mr. Koger felt "ungrounded," and believed that the link to his deity and religious community was severed as a result of the force-cut.

115.    On the evening of November 2, 2016, Mr. Koger began a hunger strike to protest the force-cut of his dreadlocks. Mr. Koger continued his hunger strike for 12 days, until November 14, 2016.

116.    On November 3, 2016—the day after TCI staff force-cut Mr. Koger's dreadlocks—Defendant Kostenko filed an initial recommendation in response to Mr. Koger's October 28, 2016, religious-accommodation request. Defendant Kostenko

20

recommended that Mr. Koger's request be denied because "[t]he growing of hair is not a granted religious accommodation."

117.    On November 7, 2016—five days after TCI staff force-cut Mr. Koger's dreadlocks—TCI's Religious Accommodation Review Committee adopted Defendant Kostenko's recommendation to deny Mr. Koger's religious-accommodation request based on the Grooming Policy.

118.    On November 8, 2016, Defendant Bracy affirmed the Religious Accommodation Review Committee's recommendation and denied Mr. Koger's religious-accommodation request.

119.    Although Mr. Koger's dreadlocks had already been force-cut, he appealed Defendant Bracy's decision to Defendant Davis and ODRC's Religious Services Administration.

120.    Defendant Davis did not issue a final decision on Mr. Koger's appeal for an accommodation to maintain his dreadlocks until November 30, 2016—28 days after TCI staff force-cut Mr. Koger's dreadlocks.

121.    In his denial of Mr. Koger's accommodation request, Defendant Davis concluded that Mr. Koger's request for an accommodation to maintain dreadlocks failed to state a religious issue.

122.    Mr. Koger continued to suffer pain related to his sinuses following the use of OC spray on November 2, 2016.

21

123.     With the loss of his dreadlocks, Mr. Koger feels that TCI stole a part of his identity, as his dreadlocks served as a reminder of his faith and devotion to the natural world.

124.     As a devout Rastafarian, Mr. Koger still desires to maintain dreadlocks and exercise his other religious beliefs.

125.     Mr. Koger's hair has grown back into dreadlocks—extending down between three and three-and-one-half inches—and will continue to grow and lock further if he is permitted to let it. Mr. Koger fears that Defendants, unless otherwise enjoined, will again discipline and punish him and ultimately forcibly cut his dreadlocks in response to his religious exercise.

126.     Defendants' continuing enforcement of the Grooming Policy and No-Exemptions Memo subject Mr. Koger to the ongoing threat of additional force-cuts and violate his sincerely held religious beliefs.

## FIRST CAUSE OF ACTION:
## VIOLATION OF RLUIPA

127.     Mr. Koger repeats and realleges the preceding paragraphs as if fully set forth herein.

128.     Defendants' institutional agencies, including ODRC and RCI, receive federal funds.

129.     The ORDC Defendants' and Mr. Marquis' policies, absolute prohibition of dreadlocks, enforcement of the No-Exemption Memo, force-cuts of Mr. Koger's dreadlocks, and refusal to consider or individually assess his religious-accommodation requests substantially burden his sincerely held religious beliefs and practices.

22

130.    The ORDC Defendants and Mr. Marquis have not established and cannot establish a compelling state interest in preventing Mr. Koger from growing dreadlocks. Moreover, they have not demonstrated and cannot demonstrate that force-cuts and denial of specific religious accommodations to Mr. Koger further any compelling state interests.

131.    Defendants' absolute prohibition on dreadlocks is not the least-restrictive means to furthering governmental interests. Defendants have previously utilized less-restrictive means, such as requiring Mr. Koger to turn his head upside-down and run his fingers through his hair, to ensure that Mr. Koger's dreadlocks do not jeopardize prison security or safety. The majority of state prison institutions and the federal prison system do not categorically prohibit the wearing of dreadlocks and do not categorically prohibit religious exemptions or accommodations for dreadlocks.

132.    Unless otherwise enjoined, the ORDC Defendants and the Mr. Marquis will continue to violate Mr. Koger's rights under RLUIPA.

**SECOND CAUSE OF ACTION:**
**VIOLATION OF 42 U.S.C. § 1983 AND THE FIRST AND FOURTEENTH**
**AMENDMENTS TO THE UNITED STATES CONSTITUTION**
**(Free-Exercise Clause)**

133.    Mr. Koger repeats and realleges the preceding paragraphs as if fully set forth herein.

134.    Defendants' policies, absolute prohibition of dreadlocks, enforcement of the No-Exemption Memo, force-cuts of Mr. Koger's dreadlocks, and refusal to consider or individually assess his religious-accommodation requests were not and are not neutral policies, because they target Rastafarians and are not neutrally applied. They therefore

23

violate the Free-Exercise Clause of the First Amendment, as incorporated by the Fourteenth Amendment.

135.    Defendants have also selectively enforced the Grooming Policy and No-Exemptions Memo because they have permitted many non-Rastafarian inmates to maintain long dreadlocks but have repeatedly force-cut Mr. Koger's dreadlocks due to his Rastafarianism, in violation of his First Amendment right to exercise his religion.

136.    Defendants have selectively refused to consider or individually assess Mr. Koger's religious-accommodation requests for dreadlocks, *ital* diet, religious texts, fast, and gathering peacefully with other members of his faith.

137.    Defendants' selective enforcement of the Grooming Policy and No-Exemptions Memo and refusal to consider or individually assess his religious-accommodation requests substantially burden Mr. Koger's sincerely held religious beliefs.

138.    Defendants' absolute ban on dreadlocks and Defendant's policies and practices fail to further any compelling governmental interests because inmates in ODRC facilities have been allowed to wear dreadlocks for years without problem, only requiring simple, additional security measures such as shaking out one's hair.

139.    Defendants' policies and practices are not narrowly tailored because the majority of jurisdictions permit Rastafarian inmates to maintain their dreadlocks and practice the tenets of their faith, employing alternative means to ensure security and heath at prison facilities, all of which are available to Defendants.

140.    Unless otherwise enjoined, the ODRC Defendants with jurisdiction over RCI and Mr. Marquis will continue to violate Mr. Koger's rights under the First and Fourteenth Amendment.

141.    As a direct and proximate result of the conduct of the ODRC Defendants with jurisdiction over TCI and the TCI Defendants—committed with malice and reckless indifference to Mr. Koger's First and Fourteenth Amendment rights—Mr. Koger has suffered bodily injury and has suffered and continues to suffer emotional trauma and distress.

**THIRD CAUSE OF ACTION:**
**VIOLATION OF 42 U.S.C. § 1983 AND THE FIRST AND FOURTEENTH**
**AMENDMENTS TO THE UNITED STATES CONSTITUTION**
**(Establishment Clause)**

142.    Mr. Koger repeats and realleges the preceding paragraphs as if fully set forth herein.

143.    Defendants' "no religious exemptions" policy for dreadlocks, as expressed in the No-Exemptions Memo and enforced by Defendants, has had no secular purpose, has inhibited religious practice as its primary effect, and thus, has violated and continues to violate the Establishment Clause of the First Amendment, as incorporated by the Fourteenth Amendment.

144.    Defendants' "no religious exemptions" policy for dreadlocks has had no secular purpose because it has prohibited religious exercise on its face and has not been narrowly tailored to achieve any purported security interests.

145.    Defendants' ban on dreadlocks has inhibited religion as its primary effect because it targets a hairstyle specific to Rastafarianism and has expressly denied

25

Mr. Koger the opportunity to wear dreadlocks for religious reasons. It therefore has demonstrated and continues to demonstrate a preference for other religions over Rastafarianism.

146.    Defendants' "no religious exemptions" policy has served no compelling government interest and has not been narrowly tailored to serve any purported government interest.

147.    Unless otherwise enjoined, the ODRC Defendants with jurisdiction over RCI and Mr. Marquis will continue to violate Mr. Koger's rights under the First and Fourteenth Amendment.

148.    As a direct and proximate result of the conduct of the ODRC Defendants with jurisdiction over TCI and the TCI Defendants—committed with malice and reckless indifference to Mr. Koger's First and Fourteenth Amendment rights—Mr. Koger has suffered bodily injury and has suffered and continues to suffer emotional trauma and distress.

### FOURTH CAUSE OF ACTION
### VIOLATION OF 42 U.S.C. § 1983 AND THE FOURTEENTH AMENDMENT
### TO THE UNITED STATES CONSTITUTION
### (Equal Protection)

149.    Mr. Koger repeats and realleges the preceding paragraphs as if fully set forth herein.

150.    Defendants' faith-specific policies and absolute prohibition of dreadlocks, enforcement of the No-Exemption Memo, force-cuts of Mr. Koger's dreadlocks, and refusal to consider or individually assess his religious-accommodation requests discriminate against Mr. Koger because of his membership in a protected class—

26

religion—and therefore violate the Equal Protection Clause of the Fourteenth Amendment.

151.    Pursuant to their faith-specific policies, Defendants have intentionally treated Rastafarians, including Mr. Koger, differently from similarly situated inmates who are practitioners of the ODRC's nine recognized religions, in violation of Mr. Koger's right to equal protection of the laws as guaranteed by the Fourteenth Amendment.

152.    As a result, Defendants have failed to treat Rastafarianism as a religion and has not considered or granted Mr. Koger's requests for religious accommodations while considering and granting other faith-practitioners' requests for religious accommodations. Defendants have thus violated Mr. Koger's right to equal protection of the laws as guaranteed by the Fourteenth Amendment.

153.    Defendants have also failed to apply the prohibition on dreadlocks in a neutral fashion by force-cutting Mr.  Koger's dreadlocks while permitting other non-Rastafarian inmates to wear dreadlocks. Defendants have thus violated Mr. Koger's right to equal protection of the laws as guaranteed by the Fourteenth Amendment.

154.    Defendants can demonstrate no compelling interests justifying their policies of differentiating between Rastafarians and recognized-faith practitioners or of treating Mr. Koger differently from non-Rastafarian inmates with dreadlocks.

155.    Unless otherwise enjoined, the ODRC Defendants with jurisdiction over RCI and Mr. Marquis will continue to violate Mr. Koger's rights under the Fourteenth Amendment.

156. As a direct and proximate result of the conduct of the ODRC Defendants with jurisdiction over TCI and the TCI Defendants—committed with malice and reckless indifference to Mr. Koger's Fourteenth Amendment rights—Mr. Koger has suffered and continues to suffer bodily injury and emotional trauma and distress.

## DEMAND FOR JURY TRIAL

Under Fed. R. Civ. P. 38, Mr. Koger demands a jury trial on all issues so triable.

## PRAYER FOR RELIEF

Plaintiff Cecil Koger requests judgment against Defendants as follows:

a.   A declaration that the Grooming Policy and No-Exemptions Memo and any similar policies in place at RCI, as applied to Mr. Koger, violate RLUIPA;

b.   A declaration that Mr. Marquis and the ODRC Defendants with jurisdiction over RCI have violated Mr. Koger's rights under RLUIPA as alleged herein;

c.   A declaration that Defendants have violated Mr. Koger's rights under the First Amendment as alleged herein;

d.   A declaration that Defendants have violated Mr. Koger's rights under the Fourteenth Amendment as alleged herein;

e.   A permanent injunction prohibiting Mr. Marquis and the ODRC Defendants with jurisdiction over RCI from enforcing ODRC's Grooming Policy against Mr. Koger by requiring him to shave or cut his dreadlocks;

f.   An injunction ordering Mr. Marquis and the ODRC Defendants with jurisdiction over RCI to develop a religious-accommodation policy for Rastafarianism with a "Procedures" section that establishes ODRC-approved accommodations for growing dreadlocks, an *ital* diet, the wearing of a tam, the provision of religious texts, and congregate services;

g.   An award of compensatory damages to Mr. Koger against the TCI Defendants and the ODRC Defendants with jurisdiction over TCI;

28

h.  An award of punitive damages to Mr. Koger against the TCI Defendants and the ODRC Defendants with jurisdiction over TCI;

i.  An award of attorney's fees pursuant to 42 U.S.C. § 1988 against Defendants;

j.  An award of costs of suit pursuant to 42 U.S.C. §§ 1920 and 1988; and

k.  Any other or further relief as this Court may deem appropriate and equitable.

Respectfully submitted,

/s/ Andrew S. Pollis
Avidan Y. Cover (Ohio Bar No. 0087534)
Andrew S. Pollis (Ohio Bar No. 0046392)
MILTON A. KRAMER LAW CLINIC CENTER
CASE WESTERN RESERVE UNIVERSITY
   SCHOOL OF LAW
11075 East Boulevard
Cleveland, Ohio 44106
(216) 368-2766
avidan.cover@case.edu
andrew.pollis@case.edu
lawclinic@case.edu
*Attorneys for Plaintiff Cecil Koger*

Dated: June 8, 2018

29

## <u>CERTIFICATE OF SERVICE</u>

I hereby state that on this 8th day of June, 2018, notice of this filing was sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

/s/ Andrew S. Pollis
Andrew S. Pollis
*Attorney for Plaintiff Cecil Koger*