## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTERN DISTRICT OF OHIO
## EASTERN DIVISION

Cecil Koger,                                          :

        Plaintiff,                           :           **Case No. 4:17-cv-02409**

        v.                                   :           **Judge Benita Y. Pearson**

Director Gary C. Mohr, et al.,                        :

        Defendants.                          :

## DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS
## OF LAW ON MATTERS NOT SUBMITTED TO THE JURY

---

Pursuant to the Court's order, ECF No. 61, Defendants propose the following findings of fact and conclusions of law regarding Plaintiff's RLUIPA claim as well as Defendants' qualified immunity, statute of limitations, and exhaustion affirmative defenses.

## FINDINGS OF FACT:
## RLUIPA, QUALIFIED IMMUNITY, EXHAUSTION, AND
## THE STATUTE OF LIMITATIONS

1. Incarcerated since January 11, 2000, Plaintiff Cecil Koger ("Plaintiff"), is serving a 30-year-to-life sentence for aggravated murder and aggravated robbery. Testimony of Defendant Bracy.

2. On April 10, 2014, Plaintiff was transferred to the Trumbull Correctional Institution ("TCI"), the institution in which he was incarcerated on November 16, 2017. Testimony of Defendant Bracy.

3. Plaintiff filed his Complaint on November 16, 2017.  ECF No. 1.

4.  On April 19, 2018, Plaintiff was transferred to the Richland Correctional Institution ("RCI"). Testimony of Defendant Bracy.

5. The PLRA, which requires inmates to exhaust their available administrative remedies regarding the conditions of their confinement, is both mandatory and a prerequisite to filing suit in federal court. Testimony of Defendant Davis. *See also Blissit v. Fiquris,* 345 F.Supp.3d 931, 937 (S.D. Ohio 2018).

6. Although Ohio has established a three-step grievance procedure for exhausting inmate claims generally relating to institutional life, OAC § 5120–9–31(K), it does not serve as an additional or substitute appeal process where a final decision has been rendered by a managing officer. Testimony of Defendant Davis.  *See also* OAC § 5120–9–31(B).

7. Since new dietary requests or requests seeking recognition of a religious holiday not previously observed fall into the latter category, 72-REG-02(VI)(G)(10), ODRC makes available a separate administrative exhaustion protocol for these requests. Testimony of Defendant Davis.

8. To administratively exhaust new dietary requests or requests seeking recognition of a religious holiday not previously observed, ODRC 72-REG-02(VI)(G)(2) requires an inmate to complete a DRC 4326 Request for Religious Accommodations form containing the following information:

   a. The religion to which the inmate belongs;

   b. The specific practice, observance, or item requested;

   c. The basis for the requested religious practice (origin of request in the writings or traditions of the faith group); and

   d. Contact information for those religious leaders who can verify the request. Testimony of Defendant Davis.

2

9. ODRC 72-REG-02(VI)(G)(3) requires that the inmate's DRC 4326 accommodations request be submitted to the Chaplain, who will meet with the inmate to attain an understanding of the substance of the accommodations request. The inmate may submit additional materials in support of his accommodations request, whether before, during, or after the meeting.  Testimony of Defendant Davis.

10. Following the meeting, ODRC 72-REG-02(VI)(G)(4) and (5) require the Chaplain to refer the inmate's accommodations request and any materials submitted in support, together with the Chaplain's recommendations recorded on a DRC 4327 Response to Request for Religious Accommodation form, to the institution's Religious Accommodation Review Committee ("Committee").  Testimony of Defendant Davis.

11. The Committee is required to evaluate the accommodations request, together with any supporting materials and the Chaplain's recommendations, with regard to its religious nature and whether it is in conflict with the prison's operational and security concerns. ODRC 72-REG-02(VI)(G)(6).  Testimony of Defendant Davis.

12. Upon completing its evaluation, the Committee is required to record its own recommendations on the DRC 4327 response form. ODRC 72-REG-02(VI)(G)(7).  Exhibit XXXX. Testimony of Defendant Davis.  *See also* Exhibit XXXX.

13. The Committee is then required to forward the inmate's DRC 4326 request, along with its recommendations which have been recorded on the DRC 4327 response form, to the Managing Officer for review. ODRC 72-REG-02(VI)(G)(8).

14.  The Managing Officer is required to record his or her recommendations on the DRC 4327 response form and then forward it, together with the inmate's DRC 4326 request and all accompanying materials, to the Religious Services Administrator ("RSA") for final

decision. The managing officer is also required to forward a copy of the DRC 4327 response form to the inmate and to the Chaplain's Office. ODRC 72-REG-02(VI)(G) (10), (H)(1), and (H)(3). Testimony of Defendant Davis.

15. The RSA's final decision is required to be distributed to the inmate, the Managing Officer, the Chaplain, and scanned into OnBase. Testimony of Defendant Davis. *See also* ODRC 72-REG-02(VI)(I).

16. Plaintiff submitted a DRC 4326 Request for Religious Accommodations form on December 16, 2009 to the Chaplain at the Toledo Correctional Institution seeking Kosher meals in lieu of an *ital* diet, and subsequently submitted a DRC 4442 Appeal form regarding the denial of the same on January 14, 2010. Testimony of Defendant Davis. *See also* ECF No. 50-1, at 491-493.

17. On August 24, 2016, Plaintiff wrote a letter alleging that he has to fast with the Muslims in order to fast. Although at the time Plaintiff was incarcerated at TCI, the letter does not indicate to whom it was addressed. Testimony of Defendant Davis. See also ECF No. 50-1, at 501-505.

18. The letter was neither scanned into OnBase, nor is it contained in the Religious Services Administrator's file. Testimony of Defendant Davis.

19. Whether at TCI or at RiCI, Rastafarian inmates do not have to change their religion to fast during Ramadan. Testimony of Defendants Kostenko, Black, Banks, and Davis.

20. Nor does an inmate need permission to fast whether at TCI or at RiCI. Testimony of Defendants Kostenko, Bracy, Black, Banks. and Davis.

21. Plaintiff submitted no DRC 4326 Request for Religious Accommodations form while at TCI seeking a special diet, religious or otherwise, or accommodations to observe any fast. Testimony of Defendant Kostenko, Bowen, and Bracy.

22. No Defendant denied Plaintiff an *ital* diet or fast days while he was at TCI. Testimony of Defendants Kostenko, Bowen, and Bracy.

23. Inmates are offered a vegetarian option, including a vegan entrée at every lunch and dinner meal, at both TCI and at RiCI. Testimony of Defendants Kostenko, Bracy, Black, Banks, and Davis.

24. On April 26, 2018, Plaintiff filled out a DRC 4326 Request for Religious Accommodations form seeking to have *ital* (organic, food vegetarian, no soy) and to observe fast days at RiCI. ECF No. 50-1, at 500.

25. The form was neither scanned into OnBase, nor is it contained in the Religious Services Administrator's file. Testimony of Defendant Davis.

26. On May 27, 2018, Plaintiff submitted a DRC 4326 Request for Religious Accommodations to the RCI Chaplain seeking to have *ital* and to observe fast days at RiCI. Testimony of Defendant Davis. See also ECF No. 52-2, at 578.

27. A copy of Plaintiff's May 27, 2018 request for accommodations submission is contained in the Religious Services Administrator's files. Testimony of Defendant Davis. *See also* ECF No. 52-2, at 578.

28. On May 27, 2018, Defendant Davis was the RSA. As such, he was charged with the authority to approve, modify or disapprove Plaintiff's accommodations request to have *ital* and for fast days. Testimony of Defendant Davis.

29. Plaintiff's May 27, 2018 religious accommodations request to have *ital* and for fast days provided no information with which to determine whether it was religiously based or in conflict with the prison's operational and security concerns. Testimony of Defendant Davis. *See also* ECF No. 52-2, at 577.

30. RiCI's Chaplain noted in his recommendations regarding Plaintiff's accommodations request that "Inmate Koger has requested … to receive organic veggie and/or vegetarian meals (*ital* meals)" and "to observe Rastafarian holidays and fast days," and recommended that the request be referred to the RSA for decision. Testimony f Defendant Davis. *See also* ECF No. 52-2, at 577.

31. The recommendations of both the Committee and the Warden were to refer Plaintiff's accommodations request to have *ital* and for fast days to the RSA for decision. These recommendations were sent to Defendant Davis on or about June 5, 2018.  Testimony of Defendant Davis.  *See also* ECF No. 52-2, at 577.

32.  Defendant Davis' July 23, 2018 final decision regarding Plaintiff's accommodations request to have *ital* and fast days was: "DRC provides a reasonable meal accommodation," and was in accordance with the Chaplain's recommendations that "Inmate Koger has requested … to receive organic veggie and/or vegetarian meals (*ital* meals)" and "to observe Rastafarian holidays and fast days." Testimony of Defendant Davis.  *See also* ECF No. 52-2, at 577.

33. The "reasonable meal accommodation" at RiCI consisted of a vegetarian option, including a vegan entree at every lunch and dinner meal.  Testimony of Defendant Davis.

34. At no time did Plaintiff submit a DRC 4326 form requesting religious accommodations to have *ital* or for fast days to TCI's Chaplain, to TCI's Deputy Warden of Operations, or to TCI's Warden. Testimony of Defendants Kostenko, Bowen and Bracy.

35. Between April 10, 2014, the date he was transferred to TCI, and April 19, 2018, the date he was transferred from TCI to RiCI, Plaintiff submitted no letter, objection, grievance or appeal related to any DRC 4326 form requesting dietary or fasting accommodations to any of the Defendants. Testimony of Defendants Kostenko, Bowen, Bracy, and Davis.

36. Nor did Plaintiff follow up the RSA's final decision on his May 27, 2018 request to have *ital* and fast days with any additional information, letters, objections, grievances or appeals. Testimony of Defendant Davis.

37. Plaintiff changed his Religion from Rastafarian to Muslim on April 11, 2018 while at TCI and has never changed it back. Testimony of Defendant Davis. ECF No. 52-2, at 573.

38. Plaintiff has never explained to the Defendants how anything more than the vegetarian/vegan option afforded him at both TCI and RiCI is either required by his religious beliefs or would substantially further his religious exercise beyond those things already permitted him. Testimony of Defendant Davis.

39. Plaintiff has provided inconsistent information pertaining to what, in his scheme of things, having *ital* means: Kosher meals; meals containing no beef, no pork, no soy, no MSG, no unnatural season enhancers and which must be prepared in a separate space by practicing Rastafarians using special tools; organic, vegetarian, unprocessed food which contains no soy; strict organic food.  Testimony of Defendant Davis.  *See also* ECF No. 50-1, at 493; ECF No. 50-1, at 473, 500; ECF No. 50, at 456.

40. Through an April 3, 2019 affidavit and his own court filing, Plaintiff informed the Court

that, in his view, having *ital* means either: a diet that is organic, vegetarian, contains no soy, and no processed food; or a strict organic diet of unprocessed foods. ECF No. 50-1, at 473, 500; ECF No. 50, at 456.

41. According to Plaintiff's sworn affidavit and court filing, having *ital* would include consuming such items as milk, cheese, eggs, ice cream, yogurt, cottage cheese, and butter so long as the food is organic and not processed. Testimony of Defendant Davis.  *Id.*

42.  Nor does the *Fetha Nagast,* cited by Plaintiff with approval in support of his May 27, 2018 DRC 4326 request, prohibit consuming animals and/or animal products but for discrete, limited fasts. Testimony of Defendant Davis.  See also ECF No. 52-3.

43. Plaintiff presently claims that in his scheme of things, having *ital* means excluding all dairy products. Testimony of Defendant Davis.

44. Plaintiff regularly purchases processed food at the commissary containing unnatural flavorings and animal product, including meat and dairy. Testimony of Defendant Black.

45. There is no consistency in Plaintiff's *ital* claims.  Testimony of Defendant Davis.

46. Plaintiff has never disclosed to any of the Defendants the religious basis for his 180 fast days.  Testimony of Defendant Davis.

47. Plaintiff has never explained to any of the Defendants how they interfered with his ability to fast. Testimony of Defendant Davis.

48. None of the Defendants intentionally took any action to prevent Plaintiff from fasting. Testimony of the Defendants Kostenko, Bowen, Bracy, Black, Banks, and Davis.

49. Plaintiff has never explained to the Defendants the religious basis for the substantive changes he continues to make regarding what, in his scheme of things, having *ital* means. Testimony of Defendant Davis.

50. Plaintiff has never explained to the Defendants how they interfered with his ability to have *ital.* Testimony of Defendant Davis.

51. None of the Defendants intentionally took any action to prevent Plaintiff from having *ital*, Testimony of Defendants Kostenko, Bowen, Bracy, Black, Banks, and Davis.

52. It was not possible to gauge from Plaintiff's May 27, 2018 DRC 4326 submission what his fasting beliefs are, what in his scheme of things having *ital* entails, or whether the request is religiously based and not in conflict with the prison's operational and security concerns. Testimony of Defendant Davis. See also ECF No. 52-2, at 578.

53. Unlike Plaintiff, those inmates who celebrate Ramadan are observing a known fast, on known dates, with a known beginning and end, requiring known accommodations. 72-REG-12 (VI)(E)(1). Thus, Plaintiff is not similarly situated in all material respects to those adherents of other religions for whom Defendants allegedly accommodate a fast. Testimony of Defendant Black.

54. There is no evidence that any of the Defendants intentionally discriminated against Plaintiff by deliberately interfering with his ability to have *ital* or fast days because of his Rastafarian faith. Testimony of Defendants Kostenko, Bowen, Bracy, Black, Banks, and Davis.

55. Defendant Davis' final decision was based on Plaintiff's failure to provide prison officials information with which to determine whether his request to have *ital* and for fast days was religiously based and not in conflict with the prison's operational and security concerns, not because of his Rastafarian faith. Testimony of Defendant Davis.

56. Providing Plaintiff with an *ital* diet implicates compelling safety, security, staffing, orderly operations and budgetary concerns. Requiring Plaintiff's meals to be specially prepared to

9

his exacting standards would require one inmate food services worker to devote his time to preparing Plaintiff's meals daily, or three meals a day, which means there would be one less worker to prepare the food for the 7197 meals served each day to the remaining 2399 inmates, resulting in major disruptions to the prison's schedule, staffing, safety, security, and budget. Testimony of Defendant Banks.

57. Prison officials are careful not to create situations of power, and Plaintiff's gang affiliation could increase the tensions among rival gang members and/or other inmates, centering around the special *ital* diet Plaintiff receives and no one else gets. And if non-gang members think Plaintiff's religious beliefs are not sincere and he is just trying to manipulate the system, they will try to extort him. Testimony of Defendant Black.

58. There are 352 gang-affiliated inmates at RiCI. While all other meals are prepared in bulk, Plaintiff's *ital* diet would be for one inmate and one inmate only. An inmate food services worker could tamper with the preparation of Mr. Koger's meal, certain that no other inmate would be served it. With any other meal it would be impossible to target one specific individual, but here Plaintiff would be singled out. That puts a huge target on his back, raising concerns both for his safety and for prison security due to the possibility of his food being tampered with. Even if inmate food services worker(s) were stopped before succeeding in doing harm, the repercussion of any attempt would likely be violent. Testimony of Defendant Banks.

59. Anything coming into the prison must be searched for contraband. RiCI and TCI are no exception. Plaintiff's *ital* diet would require special orders and deliveries of specialty items designated just for a him. Since Plaintiff is the ultimate recipient, everyone knows for whom the deliveries are ultimately intended. There are additional vulnerabilities associated

10

with deliveries for a designated recipient requiring a more particularized item-by-item search. Testimony of Defendant Banks.

60. Everything in a prison revolves around count time. But if meals are delayed because inmate food services workers are a man down preparing Mr. Koger's *ital* meals, the 2399 other inmates are going to be late getting to work, class, programming, medical services, library services, chapel, rec, etc.  Either you have angry inmates and frustrated staff, or you hire another inmate food services worker.  But there is no money in the budget with which to hire another inmate food services worker. And this is not just a one off.  The problem is going to plague the prison 365 days a year. That doesn't even begin to address the exorbitant cost of organic food or the need to hire a specially trained professional food services worker devoted to supervising the inmate food services workers' preparation of Plaintiff's *ital* diet so as to address the prison's safety and security concerns. The impact on RiCI's safety, security, orderly operations, staffing resources, and budget would be profound. Testimony of Defendant Banks.

61. With regards to Plaintiff's fast days request, the prison cannot adjust the schedule of the entire facility over a prolonged period of time for one inmate. There would be problems with the union, problems with the staff, problems with the budget, and problems with food services since neither TCI nor RiCi is staffed to provide food services after-hours.  To do so, the prison would have to add posts and negotiate with the union, but funding levels are based on operations, not one inmate. Health and welfare would also be impacted system wide due to the effect it would have on employee mandations. Testimony of Defendant Banks.

62. Any movement outside of normal operations poses problems. Staffing resources are not designed for yard movement outside normal hours. For instance, there are significantly fewer yard officers on 3rd shift. If Plaintiff needed to be escorted to the dining hall to eat before the yard and/or the dining hall opened in the morning or to eat in the dining hall after it closed, the CO would have to release him from his housing unit and a yard officer would have to escort him to the dining hall. To do this, the prison would need to pull officers from elsewhere if staff is available, call someone else in, mandate officers already there, and/or shut down services elsewhere. Testimony of Defendant Banks.

63. To accommodate an inmate's fast, you cannot just give an him a bagged pre-dawn breakfast or a bagged after-sunset dinner because you cannot know if he is going to use it in the intended way. For instance, with 360 bags of fresh fruit in his possession, the inmate could make hooch; sell the fruit to other inmates to make hooch; or be intimidated into "voluntarily" giving the bags to other inmates to make hooch.  So, you are left with sending him to the dining hall pre-dawn and after hours to eat. But any movement outside of normal operations causes deviation to the schedule. 180 days each year is not just a one-off, and adjustment for so many days is not just extra duty. Instead it becomes a full-time job. Testimony of Defendant Banks.

64. The prison's schedule is built around count and count occurs six time a day. As such, prison staffing for such things as rec, programming, medical services, library services, religious services, and food services, is structured around count. Again, count drives the schedule which drives inmate movement which drives the deployment of staff resources. It is all inter-related. Throw in a curve ball and the whole thing falls apart.  And here there isn't just one curve ball; there are 180 of them and prison officials don't even know when they

12

are going to be thrown. In sum, a prison should never even consider an inmate's request for accommodations, be it for fast days or an *ital* diet, without knowing the depth of the impact on operations, meaning the schedule, inmate movement, and staffing resources. This is the paramount safety and security concern. Testimony of Defendant Banks.

65. The cost in safety, security, and orderly operations, not to mention the impact on the prison's budget and staffing, of Plaintiff's accommodations request to have *ital* and fast days would be enormous. Prisons are neither budgeted nor staffed to provide concierge services. Even if prison officials were able to procure funding to pay for the exorbitant cost of organic food, they would also need additional funds to hire professional food services workers specially trained in the storage and preparation of organic food, who would be on site before sun-up and until Plaintiff finished his post-sundown meals during his 180 fast days, and during regular hours of operation during the remainder of the year, devoted throughout the day to supervising the delivery, preparation, service and storage of the items required for Plaintiff's *ital* diet. Nonetheless, Plaintiff would still walk around the prison all day every day with a target on his back, the only inmate out of 2399 others who would be served this food. Singled out for what other inmates would perceive as special privileges, not only would Plaintiff's food be at high risk of being adulterated, there would also be a high risk of violence stemming from any unsuccessful attempts to tamper with it. Whether looking at this from a budgetary, staffing, orderly operations, safety or security perspective, the cost implications of accommodating Mr. Koger with a unique *ital* diet or 180 fast days would be devastating, both to Plaintiff and to the prison as a whole. Testimony of Defendant Banks.

66. Defendants discussed providing Plaintiff with shelf-stable bagged meals containing such things as bread, peanut butter, fruit and salad, both on a daily basis to accommodate his request to have *ital* and to accommodate his 180 fast days but rejected it because the dietician advised them it was not nutritionally sound and would be monotonous, and because Defendants Black and Davis determined it would risk the prison's safety and security.  For instance, with 360 bags of fresh fruit in his possession, Plaintiff could make hooch; sell the fruit to other inmates to make hooch; or be intimidated into "voluntarily" giving the bags to other inmates to make hooch. It also creates problems related to infestation, bartering, and extortion. Testimony of Defendants Davis and Black.

67.  Defendants also considered letting Plaintiff pick and choose what he wanted to eat from the vegetarian option while supplementing the meals with foods from his food boxes and/or the commissary in order to have *ital.* Plaintiff could spend up to $400/month on commissary purchases.  Moreover, his housing unit has its own kitchenette, including two microwaves, two sinks, toaster ovens and hot water, with which Plaintiff can make his own food in observance of an *ital* diet. That option remains available to Plaintiff.  Testimony of Defendants Davis and Black.

68. With regard to Plaintiff's fast days request, Defendants also considered letting Plaintiff pick and choose what he wanted to eat from the vegetarian option from the dining hall when it opens in the morning and immediately before it closes at night while supplementing the meals with foods from his food boxes and/or the commissary. Again, Plaintiff could spend up to $400/month on commissary purchases. Moreover, his housing unit has its own kitchenette, including two microwaves, two sinks, toaster ovens and hot water, with which Plaintiff can make his own food in observance of his fast days. That option, too, remains

14

available to Plaintiff. Testimony of Defendants Davis and Black.

69. Plaintiff can also submit a new DRC 4326 accommodations request definitively articulating what, in his scheme of things, having *ital* means, specifically identifying the 180 fast days he wants to observe and designating the accommodations he is requesting in order to do so, and expressing in his own words the religious basis for the request so that Defendants can evaluate whether it is religiously based and not in conflict with the prison's operational and security concerns. That option also remains available to Plaintiff. Testimony of Defendant Davis.

### CONCLUSIONS OF LAW - RLUIPA

1. Plaintiff cannot recover damages under RLUIPA. *Cook v. Davis*, Civil Action 2:18-cv-1421, 2020 U.S. Dist. LEXIS 99013 (S.D. Ohio, 2020). Such claim must be heard by the Court and not decided by a jury. *Pugh v. Caruso*, No. 1:06-cv-138, 2010 U.S. Dist. LEXIS 100713, n 4 (W.D. Mich. 2010).

2. Considering a RLUIPA claim, courts must appropriately balance the prison's need to maintain safety and order with the rights protected by the Act. *Cutter v. Wilkinson*, 544 U.S. 709, 722-723 (2005).

3. To prevail on his RLUIPA claims, Plaintiff must first prove he has sincerely held religious beliefs for 180 fast days and *ital*. *See Fox v. Washington*, 949 F.3d 270, 279 (6th Cir., 2020). Second, Plaintiff must prove that the denial of the requested accommodations, beyond what is already permitted him, is a substantial burden. *Fox*, 2019 U.S. Dist. LEXIS 52008, 2019 WL 1409375, at *8. Only upon satisfaction of these two steps does the burden shift to the government to meet the compelling-interest and least restrictive-means tests. *Cavin v. Mich. Dep't of Corr.*, 927 F.3d 455, 458 (6th Cir. 2019).

15

4. The substantial burden hurdle is high, *Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x. 729 at 734 (6th Cir. 2007), and difficult to cross, *Id.*, at 736, and must place more than an inconvenience on religious exercise. *Id.* at 739.

5. ODRC has a compelling penological interests in security, safety, health, discipline, rehabilitation, order, and budgetary concerns. *Cutter v. Wilkinson*, 544 U.S. at 722-23 (2005); *Pugh v. Caruso*, Case No. 1:06-cv-138, 2010 U.S. Dist. LEXIS 100713, at * 21 (W.D. Mich. 2010).

6. Requiring Plaintiff to properly complete a DRC4326 request does not constitute a substantial burden, but rather is more accurately characterized as a mere inconvenience. *Mubashshir v. Moore,* CASE NO. 3:10 CV 2802, 2011 U.S. Dist. Ct. LEXIS 42130, at * 19 (N.D. Ohio 2011).

7. Prisons must have some way to limit religious dietary accommodations to those with sincerely held beliefs. *Id.*

8. RLUIPA is limited to intentional conduct. *Garrison v. Dutcher*, No. 1:07-cv-642, 2008 U.S. Dist. LEXIS 90504, 2008 WL 4534098, at *6 (W.D. Mich. 2008).

9. Based on the deficit of information contained in Plaintiff's May 27, 2018 request, at most the evidence supports the conclusion that one or more of the Defendants were negligent or mistaken in not providing a direct response to Plaintiff's DRC 4326 indeterminate request for fast days accommodations or in affording Plaintiff "a reasonable meal accommodation" in response to Plaintiff's non-specific request to "have *ital*." *Id.*

10. This is especially so due to Plaintiff's inconsistent dietary requests, his registration as a Muslim, and the Chaplain's recommendation that "Inmate Koger has requested … to receive organic veggie and/or vegetarian meals (*ital* meals)" and "to observe Rastafarian

holidays and fast days." *Nelson v. Jackson*, No. 2:12-cv-1167, 2014 WL 197877, at *35-36 (S.D. Ohio 2014).

11. Given that Defendants actions were at most negligent, Plaintiff cannot prevail on his RLUIPA claims since liability is limited to intentional conduct. *Id.*

12. Defendants' actions were taken to further a compelling government interest. Prisons must maintain some aspect of control in accommodating prisoners' religious requests in order to protect the security of the institution and avoid unnecessary expenses incurred for those who would assert false religious claims to gain special privileges or to disrupt prison life. *Mubashshir v. Moore,* CASE NO. 3:10 CV 2802, 2011 U.S. Dist. Ct. LEXIS 42130, at * 19 (N.D. Ohio 2011).

13. The Supreme Court does not "read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety. *Pugh v. Caruso*, Case No. 1:06-cv-138, 2010 U.S. Dist. LEXIS 100713, at * 18 (W.D. Mich. 2010).

14. The least restrictive means by which ODRC can further its compelling interest in security, safety, orderly operations, and budgetary concerns is to require inmates to submit a completed DRC 4326 articulating the specific accommodation(s) being requested along with the religious basis therefor. *Mubashshir v. Moore,* CASE NO. 3:10 CV 2802, 2011 U.S. Dist. Ct. LEXIS 42130, at * 19-20 (N.D. Ohio 2011).

15. Because Plaintiff failed to submit a DRC 4326 articulating the specific accommodation(s) being requested along with the religious basis therefor, and because of the prison's compelling interest in security, safety, orderly operations, and the budget, affording Plaintiff a vegetarian option, including a vegan entrée at every lunch and dinner meal in accordance with Defendants' understanding of what Plaintiff's accommodations request

entailed, was the least restrictive means by which Defendants could accommodate Plaintiff's *ital* diet and fast days request. *Mubashshir v. Moore,* CASE NO. 3:10 CV 2802, 2011 U.S. Dist. Ct. LEXIS 42130, at * 19 (N.D. Ohio 2011).

16. Defendants are entitled to judgment on Plaintiff's *ital* diet and fast days claims as a matter of law.

## CONCLUSIONS OF LAW– QUALIFIED IMMUNITY

1. Qualified immunity forbids awarding damages in §1983 actions against prison officials whose conduct did not violate clearly established statutory or constitutional rights. *Phillips v. Roane Cty.*, 534 F.3d 531, 538 (6th Cir. 2008).

2. A right is "clearly established" only if any reasonable official in the defendant's shoes would have understood that he was violating it. *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (*per curiam*).

3. This standard is satisfied only when existing precedent places "the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

4. Accordingly, the clearly established right must be defined with specificity. *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (*per curiam*).

5. Government officials are entitled to qualified immunity if their decision was reasonable, even if mistaken. *Hunter v. Bryant*, 502 U.S. 224, 229 (1991).

6. Once qualified immunity is raised, the plaintiff bears the burden of showing that the defendant is not entitled to qualified immunity. *Johnson v. Moseley,* 790 F.3d 649, 653 (6th Cir. 2015) (citing *Reilly v. Vadlamudi,* 680 F.3d 617, 623 (6th Cir. 2012)).

7. To determine whether a right is clearly established, courts must first hone in on the specific context of the case. *Soudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 568 (6th Cir. 2013).

18

8.  The court must then decide whether the illegality of the challenged action, given the context, is sufficiently obvious. *Id.*

9.   A defendant is entitled to qualified immunity unless the illegality of the challenged action was so obvious that only a "plainly incompetent" officer would fail to see it. *City & Cty. of S.F. v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (*quoting al-Kidd*, 563 U.S. at 743).

10. In light of preexisting law, unlawfulness must be apparent. *Anderson v. Creighton,* 483 U.S. 635, 640 (1987).

11. In *Curry v. Bobby*, No. 4:09-CV-614, 2010 U.S. Dist. LEXIS 28290, at * 13 (N.D. Ohio 2010), the court held that the refusal of prison officials to provide the inmate, a practicing Rastafarian, with an *ital* diet, comported not only with RLUIPA, but also with a rational basis review under §1983.

12. The *Curry* court found prison officials had legitimate, penological justifications for denying the plaintiff an *ital* diet, stating that providing him the standard vegetarian options, rather than a diet composed of natural foods, not only saves the prison money and trouble, it also lessens potential security concerns. *Id.*

13. Considering whether to grant prison officials qualified immunity, the court in *Colvin v. Caruso,* reasoned that "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the [conduct of a government official]. *Colvin v. Caruso*, 605 F.3d 282, 291(6th Cir. 2010) (quoting *Dorsey v. Barber,* 517 F.3d 389, 394 (6th Cir. 2008).

14. Determining there was no evidence that the chaplain unreasonably or knowingly violated the inmate's rights, the *Colvin* court granted him qualified immunity. *Id.*

15. As to the remaining defendants, the *Colvin* court likewise concluded that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law," *Id*. at 291 (quoting *Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007),  and granted them qualified immunity as well because there was no evidence that their mistakes were willful.  *Id.* at 293.

16.  The decisions in *Bobby* and *Colvin* are still good law. *Curry v. Bobby*, No. 4:09-CV-614, 2010 U.S. Dist. LEXIS 28290, at * 13 (N.D. Ohio 2010); *Colvin v. Caruso*, 605 F.3d 282, 291(6th Cir. 2010).

17.  There is no precedent from either the Sixth Circuit or the Supreme Court establishing beyond debate that the Constitution requires inmates to have *ital* despite the prison's compelling interest in security, safety, health, discipline, rehabilitation, order, and budgetary concerns.  *Curry v. Bobby*, No. 4:09-CV-614, 2010 U.S. Dist. LEXIS 28290, at * 13 (N.D. Ohio 2010).

18. Nor is there any precedent from either the Sixth Circuit or the Supreme Court establishing beyond debate that prison officials must accommodate fasts for undesignated holidays, in unknown quantities, on unknown dates, with unknown accommodations, thereby compromising the compelling security, safety, health, discipline, rehabilitation, order, and budgetary interests of the institution. *Colvin v. Caruso*, 605 F.3d 282, 291(6th Cir. 2010).

19. Each Defendant acted reasonably in response to Plaintiff's indeterminate accommodations request to have *ital* and for fast days.  *Curry v. Bobby*, No. 4:09-CV-614, 2010 U.S. Dist. LEXIS 28290, at * 13 (N.D. Ohio 2010); *Colvin v. Caruso*, 605 F.3d 282, 291(6th Cir. 2010).

20

20. Plaintiff is not "similarly situated in all material respects" to those adherents of other religions for whom Defendants allegedly accommodate a fast. *Maye v. Klee,* 915 F.3d 1076, 1086 (6th Cir. 2019).

21. No Defendant violated a clearly established law of which a reasonable person would have known that his conduct was unconstitutional. *Curry v. Bobby*, No. 4:09-CV-614, 2010 U.S. Dist. LEXIS 28290, at * 13 (N.D. Ohio 2010); *Colvin v. Caruso*, 605 F.3d 282, 291(6th Cir. 2010).

22. Because the alleged unconstitutionality of Defendants' actions was not so obvious that only a plainly incompetent officer would not see it, Defendants are each entitled to qualified immunity on Plaintiff's First and Fourteenth Amendment *ital* and fast days claims. *Curry v. Bobby*, No. 4:09-CV-614, 2010 U.S. Dist. LEXIS 28290, at * 13 (N.D. Ohio 2010); *Colvin v. Caruso*, 605 F.3d 282, 291(6th Cir. 2010).

23. Defendants are entitled to qualified immunity on Plaintiff's §1983 damage claims as a matter of law. *Curry v. Bobby*, No. 4:09-CV-614, 2010 U.S. Dist. LEXIS 28290, at * 13 (N.D. Ohio 2010); *Colvin v. Caruso*, 605 F.3d 282, 291(6th Cir. 2010); *Maye v. Klee,* 915 F.3d 1076, 1086 (6th Cir. 2019).

## CONCLUSIONS OF LAW – STATUTE OF LIMITATIONS

1. There is a two-year statute of limitations for prisoner conditions of confinement cases brought in Ohio pursuant to 42 U.S.C. § 1983. *Heyward v. Cooper*, No. 3:16-CV-2774, 2019 U.S. Dist. LEXIS 54350, 2019 WL 1428341, at *5 (N.D. Ohio Mar. 29, 2019).

2. There is a four-year statute of limitations applicable to all claims filed by inmates under RLUIPA. *Dayson v. Cass County Bd. of Comm'rs,* Case No. 1:12-cv-1307, 2013 U.S. Dist. LEXIS 51484, at *7 (W.D. Mich. 2013).

3. To invoke the continuing violation theory to save his RLUIPA claims predating November 16, 2913 and/or his §1983 claims predating November 16, 2015, Plaintiff must establish that Defendants' actions and/or policies constituted: (1) a "form of *intentional* discrimination;" (2) applied "against the class of which plaintiff was a member;" and (3) as "standing operating procedure." *Click v. Thompson*, 926 F. Supp. 2d at 975 (quoting *EEOC v. Penton Indus. Pub. Co., Inc.*, 851 F.2d 835, 838 (6th Cir. 1988). However, that requires proving more than discrimination against the Plaintiff. *Id*

4. In *Sharpe v. Cureton*, 319 F.3d 259, 268-69 (6th Cir. 2003), the plaintiffs alleged that the mayor had maintained a policy of disregarding worker's constitutional rights for three decades. *Id.* at 260. The court held that the record did not support the allegation because, out of the thousands of city workers employed over the alleged three-decade-long period of discrimination, the plaintiffs produced just one retired firefighter, and he testified only that there were allegations of patronage in the late 1980's. *Id; see also Janikowski v. Bendix Corp.*, 823 F.2d 945, 948 (6th Cir. 1987) (refusing to apply the continuing-violation doctrine where there was "no over-arching policy of discrimination against fifty year olds").

5. In accordance with the ruling in *Sharpe,* to establish a continuing violation Plaintiff must produce evidence showing more than isolated or sporadic acts of discrimination; rather, he must show that intentional discrimination against Rastafarian inmates was "standard operating procedure." *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336

22

(1977). Otherwise, he cannot rely on the continuing violation doctrine. *Click v. Thompson*, 926 F. Supp. 2d at 976.

6.  But Plaintiff's allegations are merely conclusory, unsupported by any specific evidence which would lead the Court to concluded there existed a continuing violation of intentional discrimination against Rastafarian inmates from 2009 to 2018. Plaintiff's vague allegations regarding incidents from 2009 through 2018 are hardly specific and related instances of intentional discrimination. Nor do discrete incidents of discrimination that are unrelated to an identifiable policy or practice amount to a continuing violation unless they are specifically related and allowed to continue unremedied for so long as to amount to a an intentionally discriminatory policy or practice. *Sharpe*, 319 F.3d at 267.

7.  However, the incidents at issue here were submitted for different accommodations, to different prison officials, at different institutions, over vastly different time periods, many years apart, with different results. ECF No. 50-1, at 472-475. For instance, Plaintiff's requests for a head covering (tam) and religious literature were accommodated.  ECF No. 52-2, at 574-75.  Nor is there any evidence that Plaintiff's requests for meditation, grounding, fasting, or *ital* were ever denied. ECF No. 52-2, at 577.  *See Sharpe*, 319 F.3d at 267.

8.  As such, the sporadic incidents Plaintiff cites are related neither to each other nor to an identifiable policy or practice of discrimination. Nor has Plaintiff brought forth any other witnesses out of the thousands of inmates incarcerated at ODRC to support the claim that intentional discrimination against Rastafarian inmates was standard operating procedure from 2009 through 2018. *See Sharpe*, 319 F.3d at 267.

9.  Since there is no evidence that intentional discrimination against Rastafarian inmates was "standard operating procedure" at ODRC between 2009 and 2018, any RLUIPA claims accruing prior to November 16, 2013, and any constitutional claims accruing prior to November 16, 2015, are time barred as a matter of law. *Dayson v. Cass County Bd. of Comm'rs,* Case No. 1:12-cv-1307, 2013 U.S. Dist. LEXIS 51484, at *7 (W.D. Mich. 2013); *Heyward v. Cooper*, No. 3:16-CV-2774, 2019 U.S. Dist. LEXIS 54350, 2019 WL 1428341, at *5 (N.D. Ohio Mar. 29, 2019).

## CONCLUSIONS OF LAW – EXHAUSTION

1.  The Prison Litigation Reform Act of 1996 ("PLRA") requires inmates to exhaust their available administrative remedies. Not only is the PLRA's exhaustion requirement mandatory, *Coleman v. Washington*, No. 18-13171, 2020 WL 4932110, at *2 (E.D. Mich. Aug. 24, 2020), it is also a prerequisite to filing suit in federal court. *Blissit v. Fiquris,* 345 F.Supp.3d 931, 937 (S.D. Ohio 2018).

2.  Although Ohio has established a three-step grievance procedure for exhausting inmate claims generally relating to institutional life, OAC § 5120–9–31(K), it does not serve as an additional or substitute appeal process where a final decision has been rendered by a managing officer. OAC § 5120–9–31(B).

3.  Since new dietary requests or requests seeking recognition of a religious holiday not previously observed fall into the latter category, 72-REG-02(VI)(G)(10), ODRC makes available a separate administrative exhaustion protocol for these requests. *Id.*

4.  For purposes of exhaustion of new or special dietary requests or for the recognition of a religious holiday not previously observed, the decision of the RSA, here Defendant Davis, is final. *Id.*

5. To administratively exhaust a new dietary claim or a request that a new holiday be observed or recognized, an inmate cannot just claim to belong to a particular religion. Instead, the inmate must obtain a final decision on his or her completed DRC 4326 form from the RSA, **72-**REG-02(VI)(G), before commencing suit in federal court.  *Blissit v. Fiquris,* 345 F.Supp.3d 931, 937 (S.D. Ohio 2018).

6. This case is on remand from the Court of Appeals to conduct further proceedings regarding Plaintiff's accommodations request to have *ital* and for fast days.  ECF No. 59.

7. The issue whether Plaintiff's accommodations request to have *ital* and for fast days was administrative exhausted pursuant to 72-REG-02(VI)(G)(10) was never considered by the Court.  ECF No. 56, at 651-52.

8. Rather, only Plaintiff's failure to administratively exhaust his fast days claim pursuant to OAC § 5120–9–31(K) was addressed by the Court in its summary judgment ruling. ECF No. 56, at 651.

9. Because Defendants failed to justify their failure to identify Kelly Riehl in their disclosures or discovery responses, and because this failure arguably precluded Plaintiff from obtaining discoverable information from the affiant, the Court disregarded all references to her affidavit or by her affidavit to ODRC's grievance procedure, OAC § 5120–9–31(K), in Defendants' reply brief. ECF No. 56, at 652.

10. But not only is Defendant Davis a Defendant in this case, he was also identified in Defendants' disclosures. Therefore, unlike Ms. Riehl, Defendant Davis can provide evidence regarding Plaintiff's failure to administratively exhaust his *ital* and fast days claims pursuant to 72-REG-02(VI)(G)(10). ECF No. 52-2, at 567.

11. Because Plaintiff filed his Complaint on November 16, 2017, ECF No. 1, but did not submit his DRC 4326 Request for Religious Accommodations form to have *ital* or for fast days until May 27, 2018, ECF No. 52-2, at 578, he could not have obtained a final decision from the RSA, here Defendant Davis, as is required by 72-REG-02(VI)(G)(10) before filing this lawsuit. *Blissit v. Fiquris,* 345 F.Supp.3d 931, 937 (S.D. Ohio 2018).

12. While courts *cannot* excuse an inmate's obligation to timely exhaust administrative remedies, *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016), they *can* allow exhaustion defenses to be raised again if a case is reopened on remand. *Lee v. Willey,* No. 10-12625, 2014 U.S. Dist. LEXIs 12709, at * 7 (W.D. Mich. 2018) (finding the issue of exhaustion was still pending after the case was remanded by the Court of Appeals).

13. Since Plaintiff was required to administratively exhaust his *ital* and fast days claims pursuant to 72-REG-02(VI)(G)(10) prior to filing this lawsuit but failed to do so, he has failed to administratively exhaust these claims. Testimony of Defendant Davis; ECF No. 52-2, at 578; *Blissit v. Fiquris,* 345 F.Supp.3d 931, 937 (S.D. Ohio 2018).

14. Because neither Plaintiff's constitutional or statutory claims were administratively exhausted before this lawsuit was commenced, Defendants should be awarded judgment on both Plaintiff's *ital* and fast days claims as a matter of law.

Respectfully submitted,

DAVE YOST
Ohio Attorney General


/s/ Mindy Worly
MINDY WORLY (0037395)
TRACY L. BRADFORD (0058556)
TONY H. SHANG (0100246)
    *Lead counsel*
Assistant Attorneys General

26

Criminal Justice Section
Corrections Litigation Unit
30 East Broad Street, 23rd Floor
Columbus, Ohio 43215
T: (614) 728-0161; F: (866) 474-4985
Mindy.Worly@OhioAGO.gov
Tracy.Bradford@OhioAGO.gov
Tony.Shang@OhioAGO.gov

*Trial Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of September, 2021, a copy of the foregoing was filed electronically utilizing the Clerk's ECF system. Notice of this filing will be sent to all parties by the operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Mindy Worly
MINDY WORLY (0037395)
Principal Assistant Attorney General